# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| ROY M. HUDNALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:16-cv-00092-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Nancy A. Berryhill,* | ) | |
| *Acting Commissioner of SSA,*[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Roy M. Hudnall appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[2] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Hudnall applied for SSI in September 2007, alleging disability as of January 27, 2007. (DE 12 Administrative Record ("AR") 13, 190-93). SSI is not payable prior to the month following the month in which the application was filed. 20 C.F.R. § 416.335. Therefore, the first month in which Hudnall is eligible to receive SSI benefits is October 2007.

Hudnall's application was denied by an administrative law judge in January 2010 after an

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

administrative hearing. (AR 746-54). The Appeals Council denied review of Hudnall's claim in January 2011. (AR 760-64). Hudnall appealed the Commissioner's final decision to this Court, and in January 2012, pursuant to the parties' joint motion to remand, the Court remanded the case back to the Commissioner. *See Hudnall v. Comm'r of Soc. Sec.*, No. 1:11-cv-00101-RBC (N.D. Ind. Jan 9, 2012).

In September 2012, a second administrative law judge denied Hudnall's claim. (AR 775-86). After granting Hudnall's request for review, the Appeals Council remanded the case back to an administrative law judge in January 2014. (AR 795-800).

On July 30, 2014, a hearing was conducted by Administrative Law Steven J. Neary ("the ALJ"), at which Hudnall, who was represented by counsel; Hudnall's wife; and Charles McBee, a vocational expert (the "VE"), testified. (AR 612-36). On October 24, 2014, the ALJ rendered an unfavorable decision to Hudnall, concluding that he was not disabled since September 10, 2007, the date his application was filed, because he could perform a significant number of unskilled, light occupations in the economy despite the limitations caused by his impairments. (AR 588-601). The Appeals Council denied Hudnall's request for review (AR 533-38), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Hudnall filed a complaint with this Court on March 18, 2016, seeking relief from the Commissioner's final decision. (DE 1). Hudnall argues in this appeal that the ALJ: (1) improperly evaluated the opinion of his treating physician, Dr. Lilly Bontrager; (2) improperly evaluated the opinion of an examining physician, Dr. Michael Holton; (3) improperly discounted his symptom testimony; and (4) failed to adequately account for his moderate limitations in

concentration, persistence, or pace when crafting the residual functional capacity ("RFC") and when posing hypotheticals to the VE. (DE 20 at 15-24).

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Hudnall was 43 years old (AR 190, 601); had a tenth grade education (DE 218); and had past relevant work experience as an installer (AR 121, 282). Hudnall alleges disability due to degenerative disc disease of the lumbar spine, migraine headaches, major depression, somatization disorder, and a pain disorder associated with psychological factors and a general medical condition. (DE 20 at 2).

### B.  Hudnall's Testimony at the Hearing

At the hearing, Hudnall, who was six feet tall and weighed 143 pounds, testified that he lives with his wife, who is employed outside the home, and their two sons, ages six and 16. (AR 616, 618, 630). In a typical day, Hudnall rises at about noon, because his medication often keeps him awake for three or four hours in the middle of the night. (AR 623-24). His wife gets his clothes ready for him, but he is able to dress himself. (AR 624). His wife cooks the meals, and her mother or sister help care for the children. (AR 625). He helps "a little bit" with the housework at his own pace, in that he will occasionally sweep the floor or help with the dishes, resting intermittently. (AR 625). He typically does not leave home; his interests include drawing. (AR 625-26).

When asked why he thought he could not work, Hudnall stated that he gets migraine headaches two to three times a week, each of which lasts up to three hours. (AR 620). When he

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,315-page administrative record necessary to the decision.

gets a migraine, he lies down in a darkened room. (AR 620). He also suffers from constant, throbbing pain in his back and right hip, which worsens with activity. (AR 620-22). He takes narcotic pain medications, Percocet and Opana, for this pain. (AR 620-21). He complained of a loss of appetite as a medication side effect, stating that he had lost 30 pounds since taking Percocet. (AR 622). Hudnall estimated that he could walk for about 20 minutes, stand for 15 minutes, and lift five pounds. (AR 622-23). When sitting, unless he is in a recliner, he leans to the right and supports himself on his right arm to minimize his back pain. (AR 623).

Hudnall testified that his depression also prevents him from working, as he gets angry and does not get along well with others. (AR 626-27). He stated that his medications cause him difficulty with concentrating and staying focused. (AR 627). He had been going to the Northeastern Center for mental health care, but he could no longer afford to do so. (AR 629).[4]

## C. Summary of the Relevant Medical Evidence

On October 11, 2007, Hudnall presented to the emergency room with a one-week history of back pain after lifting a motorcycle. (AR 344). His back pain radiated down his right lower leg. (AR 344). On clinical exam, he had normal station and gait without ataxia, no spinal tenderness, but moderate point tenderness around the upper aspect of the lumbar spine. (AR 345). He was diagnosed with acute lower back strain and right lower extremity radiculopathy. (AR 345). He was given oral medications. (AR 345).

In early November 2007, Dr. Lilly Bontrager saw Hudnall as a follow-up to his

---

[4] Hudnall's wife also testified at the hearing, essentially corroborating Hudnall's testimony. (AR 629-30). She emphasized that he is in constant pain and that she and her stepson do everything around the house, including shopping. (AR 630-31). She stated that Hudnall lies down "a lot" during the day and has to sit "at an angle." (AR 631-32). His left ankle swells up "real big." (AR 632). He lies in a darkened room during a migraine. (AR 631). When she calls him on her lunch break, he is "usually just getting out of bed." (AR 630).

emergency room visit for back pain. (AR 426). Hudnall presented with continued shooting pain, stating that his medicines were not helping. (AR 426). He relayed a five-year history of low-to-moderate intensity back pain; he also stated that his right ankle swells frequently. (AR 426). On clinical exam, Hudnall appeared to be uncomfortable; he preferred standing over sitting or lying down. (AR 426). He had tenderness in the mid-thoracic region, which worsened at the lower lumbar region; his paraspinal muscles were involved bilaterally, and the pain radiated down his right leg with palpation. (AR 426). Dr. Bontrager diagnosed Hudnall with back pain with right sciatica and ordered a lumbar MRI. (AR 426). The MRI showed minimal diffuse disc bulges at several levels without evidence of neural impingement, and mild facet joint degenerative changes, predominantly at L4-L5. (AR 377).

In mid-November 2007, Dr. Michael Holton examined Hudnall at the request of the state agency. (AR 356-59). Hudnall reported worsening back pain that began six years earlier. (AR 356). He stated that his pain ranged from a "six" to a "10" on a 10-point scale; the pain radiates down both legs at times, but he could not afford to see a specialist. (AR 356). Dr. Holton observed that Hudnall appeared uncomfortable and frequently changed position. (AR 357). He exhibited moderate halting features with increased low back discomfort when moving from a chair to an exam table. (AR 357). He demonstrated an antalgic gait favoring his right leg and mild associated slowing and instability. (AR 358). Dr. Holton found Hudnall too unstable to safely attempt the requested ambulatory maneuvers. (AR 358). He had diffuse tenderness of the paralumbar areas, some moderate stiffness, and some guarding of the shoulders; however, an apprehension test was negative bilaterally. (AR 358). He had some limitations in range of motion, but his muscle strength and tone were normal except in his right leg. (AR 358, 360). A

sensory exam revealed reduced light touch in the L4, L5, and S1 dermatomes. (AR 358). A straight leg raise test was positive on the right, but negative on the left. (AR 358). Dr. Holton diagnosed chronic low back pain with radicular features; joint pain, cannot exclude underlying degenerative joint disease; and chronic pain, under suboptimal control. (AR 358). He concluded that Hudnall would have difficulty performing light sedentary work on a limited basis even with modifications, "given his uncontrolled pain among other things which would result in a lot of difficulty maintaining concentration when performing even fairly simple, nonrepetitive tasks given his continuous level of pain." (AR 359). Dr. Holton stated that Hudnall would clearly benefit from evaluation and treatment by a physical medicine specialist and a spine surgeon. (AR 359).

In late November 2007, Hudnall returned to Dr. Bontrager, reporting continued back pain despite taking prednisone. (AR 425). He still had sciatica on the right and had difficulty sitting for several minutes on the right side; his pain worsened with bending. (AR 425). He rated his pain as a "seven." (AR 425). Dr. Bontrager observed that the MRI showed mild degenerative changes at L4-L5 without evidence of neuro impingement. (AR 425). On physical exam, Hudnall had lower lumbar and paraspinal tenderness; an equivocal straight leg test bilaterally; limited flexion, extension, and side-to-side motion, but close to normal twisting; and symptoms radiating mildly into the right buttock and thigh region. (AR 425).

Hudnall visited the emergency room in December 2007 for back spasms. (AR 373). He returned to the emergency room the following month with complaints of worsening pain in his left big toe. (AR 384). He was diagnosed with left great toe cellulitis and infected ingrown toenail. (AR 385).

Also in December 2007, Dr. M. Brill, a state agency physician, reviewed Hudnall's record and concluded that he could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 363-70). Dr. Brill's opinion was affirmed by Dr. B. Whitley, another state agency physician, in February 2008. (AR 394).

In March 2008, Wayne J. Von Bargen, Ph.D., conducted a psychological evaluation at the request of the state agency. (AR 395-401). Dr. Von Bargen noted that Hudnall appeared distracted at times; his mood was dysphoric and irritable. (AR 395). He complained of difficulty concentrating and always feeling angry and aggravated. (AR 395-96). He reported a suicide attempt in 2003, but he denied any current plan or intent. (AR 395). Hudnall was able to repeat four digits forward and two digits backward; he was able to correctly perform simple arithmetic calculations. (AR 396). On the Wechsler Memory Scale–Third Edition, he earned indexes ranging from 47 to 61, which fell within the impaired range. (AR 396). Dr. Von Bargen found that although the etiology of his symptoms was not clear, Hudnall's results indicated concentration and memory function at levels significantly below that of others his age. (AR 397). Dr. Von Bargen thought that Hudnall's depression and his sustaining a past severe electric shock may be contributory. (AR 397). Dr. Von Bargen diagnosed major depressive disorder; amnestic disorder, not otherwise specified ("NOS"); and rule-out pain disorder. (AR 397). Hudnall was assigned a Global Assessment of Functioning ("GAF") score of 50.[5] (AR 397).

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of*

Later in March 2008, Joelle Larsen, Ph.D., a state agency psychologist, reviewed Hudnall's record and completed psychiatric review technique and mental RFC assessment forms. (AR 404-20).  On the psychiatric review technique, Dr. Larsen found that Hudnall had mild difficulties in maintaining social functioning and moderate difficulties in activities of daily living and in maintaining concentration, persistence, or pace.  (AR 414).  On the mental RFC, Dr. Larsen concluded that Hudnall was markedly limited in understanding, remembering, and carrying out detailed instructions and moderately limited in maintaining attention and concentration for extended periods.  (AR 418).  In her narrative, Dr. Larsen wrote that Hudnall was capable of understanding, remembering, and carrying out simple instructions, but that there would be deficits with more detailed instructions.  (AR 429).  She opined that he was capable of making simple work-related decisions, remembering locations and simple work-like procedures, observing safety precautions, maintaining an ordinary routine without special supervision, relating adequately to coworkers and supervisors, attending to tasks for extended periods, maintaining a schedule, managing stress, adapting to changes in the work place, and maintaining a normal work pace.  (AR 420).  Dr. Larsen concluded that although Hudnall has a severely limiting condition, he "retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations."  (AR 420).

In May 2008, Hudnall saw Dr. Bontrager for renewal of his prescriptions.  (AR 519).  In August 2008, Hudnall visited Dr. Bontrager, reporting no change in his back pain.  (AR 447).  In the past month, he had felt intermittent general sensitivity to touch.  (AR 447).  He did not feel

---

*Mental Disorders* 16 (5th ed. 2013)).  However, several medical sources of record used GAF scores in assessing Hudnall, so they are relevant to the ALJ's decision.  *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

physical therapy would make a difference and had concerns about costs and scheduling.  (AR 447).  He was taking Celexa, but noted no difference in his mood.  (AR 447).  Hudnall reported that his depression had worsened since losing his job; he was looking for work, but nothing had opened up yet.  (AR 447).  He thought that his pain issues may have exacerbated his depression, but he denied any suicidal or homicidal intent.  (AR 447).  On physical exam, Hudnall had mild lower thoracic and lower lumbar paraspinal muscle tenderness without radiation of symptoms to his legs or buttocks.  (AR 447).

In early October 2008, Hudnall returned to Dr. Bontrager, reporting that his back and leg pain were about the same, which contributed to his depression.  (AR 446).  He did not think physical therapy was helping him, aside from the electrical stimulation modality.  (AR 446).  On exam, he had mild tenderness in the paraspinal muscles, which was not consistent all the time.  (AR 444).  He had limited movement in extension and 40 degrees of flexion; side-to-side and twisting motions were normal, but bending was difficult.  (AR 444).  Deep tendon reflexes were normal.  (AR 444).  Dr. Bontrager reviewed Hudnall's medications and encouraged him to continue physical therapy and to increase his activity.  (AR 444).  In late October 2008, Hudnall reported to Dr. Bontrager that his joint pain had worsened.  (AR 444).  Vicodin only worked part of the time, and it caused him nausea at night; Amitryptiline made him feel groggy all day.  (AR 444).  He had attended four physical therapy sessions, but he did not find them helpful.  (AR 444).  His back condition was unchanged; he stated that he hurt all the time, but that quick movements were not as bad as sustained positions.  (AR 442).  He was able to bend over to pick something up from the floor without too much difficulty.  (AR 442).  Dr. Bontrager stopped the Amitryptiline, started him on Neurontin, and continued his Vicodin and Celexa.  (AR 442).

In December 2008, Hudnall told Dr. Bontrager that his back pain was bad due to weather changes. (AR 442). He was excited about his new baby, and he was watching the baby at home. (AR 442). He had run out of Neurontin. (AR 442). He reported having a migraine headache that came and went. (AR 442). Upon exam, he had pain in the thoracic and lumbar areas. (AR 442). Dr. Bontrager renewed Hudnall's medications. (AR 441).

In January 2009, Hudnall reported to Dr. Bontrager that he continued to have back pain, describing it as "severe" and rating it a "seven" on a 10-point scale. (AR 440). He stated that the Neurontin was not helping and that if it was not for Vicodin, he would not get up in the morning. (AR 440). A straight-leg raise test was negative bilaterally; his gait and strength were normal. (AR 440). His lumbar range of motion was: 50 degrees flexion, 20 degrees extension, 30 degrees lateral bending, and 30 degrees rotation. (AR 440). Dr. Bontrager assessed that Hudnall's back pain was unchanged. (AR 440). She indicated that depression was still an issue, but that it was mostly related to his pain issues and his not having steady work. (AR 440). In February, Hudnall told Dr. Bontrager that Neurontin was not making a difference in his back pain. (AR 439). He had a hiatal hernia. (AR 439). An examination showed pain in his lower lumbar region, which radiated toward his hip area, and tenderness in his paraspinal muscles. (AR 439). In March, Hudnall reported that picking up his son was very painful. (AR 438). He rated his pain as an "eight." (AR 437). A physical exam was unchanged. (AR 437).

In April 2009, Dr. David Stensland saw Hudnall upon referral from Dr. Bontrager for chronic low back pain with intermittent lower extremity pain. (AR 428-29). Hudnall stated that his back pain was constant and varied between a "six" and a "10." (AR 429). The pain was exacerbated by lifting, bending, and standing and was alleviated by medications and rest. (AR

429).  Upon physical exam, Dr. Stensland noted tenderness upon palpation in the right L2-L3, L3-L4 posterior element.  (AR 429).  Extension exacerbated his pain more than flexion.  (AR 429).  His stability, strength, and muscle tone of his back and legs were within normal limits, except that his left ankle dorsiflexion was 4/5.  (AR 429).  A straight leg raise test was positive on the right and negative on the left.  (AR 429).  He had no atrophy or tenderness in his lower extremities.  (AR 429).  He had some diminished sensation in the right S1 dermatomal distribution, with intact, but diminished, light touch.  (AR 429).  He was able to toe and heel walk, and his gait was nonantalgic.  (AR 429).  Dr. Stensland's impression was low back pain with an etiology of lumbar spondylosis.  (AR 428).  He noted that Hudnall's MRI showed minimal disc bulging at several levels; mild facet joint degenerative changes, predominantly at L4-L5; but no significant neural compressive lesion.  (AR 428).  Dr. Stensland recommended that Hudnall undergo bilateral L3-L4 and L4-L5 intrarticular facet joint injections for diagnostic and potentially therapeutic purposes.  (AR 428).

In May 2009, Hudnall reported to Dr. Bontrager that he was working with Dr. Stensland to schedule spinal injections; he asked for pain medication to cover him in the interim.  (AR 437).  In July, Hudnall was still working on insurance issues with Dr. Stensland concerning injections; Hudnall was taking Percocet.  (AR 434).  In August 2009, Dr. Bontrager completed a questionnaire on Hudnall's behalf.  (AR 509-10).  In response to a question asking whether Hudnall's headache complaints were consistent with his medical condition, and whether his complaints of back pain and limitations were consistent with "the medical needs," Dr. Bontrager answer, "Yes."  (AR 509).  In response to a question asking whether she considered Hudnall disabled from full-time employment, Dr. Bontrager responded:  "2 year disability seems

reasonable.  Pain mgmt doc recommended injections or surgery.  Pt unable to obtain due to no insurance.  This intervention may help patient get back on his feet."  (AR 510).  On September 10, 2009, Dr. Bontrager completed another checklist on Hudnall's behalf, indicating that he had "significant" limitations in sitting, standing, walking, lifting, pushing, pulling, bending, squatting, crawling, and climbing; and "moderate" limitations in grasping, manipulating, reaching above shoulders, repetitive leg movements, and caring for personal needs.  (AR 512).

In September 2009, Hudnall reported significant depression to Dr. Bontrager.  (AR 1091).  He was assessed with chronic back pain, anxiety, migraines/tension headaches, and depression; medications were prescribed.  (AR 1091).  A back examination was unchanged.  (AR 1091).   The following month, Hudnall told Dr. Bontrager that he had experienced bad headaches within the last month and that he wakes up with a headache.  (AR 1089).  His headaches worsened with light exposure and were alleviated by lying down and resting.  (AR 1088).

In October 2009, Dr. Bontrager completed another questionnaire on Hudnall's behalf.  (AR 1204-06).  Dr. Bontrager wrote that Hudnall could sit less than 30 minutes at a time and less than one hour total in an eight-hour workday; stand for less than 30 minutes at a time and less than one hour total in an eight-hour workday; and walk for less than 45 minutes at a time and less than one hour total in an eight-hour workday.  (AR 1205).  He could lift or carry 10 pounds frequently and 20 pounds occasionally, but must not lift or carry continuously or ever more than 20 pounds.  (AR 1205).  He could not repetitively push or pull arm controls or leg controls.  (AR 1205).  He could never bend, squat, crawl, climb, or reach.  (AR 1206).  He had moderate restrictions in driving and mild restrictions in unprotected heights.  (AR 1206).  Dr. Bontrager opined that Hudnall's chronic pain, depression, and migraine headaches also caused him

difficulty with concentrating; attending; understanding, remembering, and carrying out instructions; "[r]esponding appropriately to superior, coworkers [and] situations"; performing sustained activity on a consistent basis; and traveling alone to or from work. (AR 1206).

In November 2009, Hudnall reported to Dr. Bontrager that he had continued neck and back pain, together with four to six migraine headaches per week. (AR 1087). He reported photosensitivity, but no nausea; his headaches were relieved by lying down. (AR 1087). Dr. Bontrager referred Hudnall to Dr. Stensland for pain management. (AR 1087). In January 2010, Hudnall reported having headaches once a week. (AR 1086). Nortriptyline helped him sleep but did not help his headaches. (AR 1086). In February, Hudnall stated that he continued to have headaches and that Vicodin was not working well. (AR 1084). His back pain was unchanged, and he was having trouble with his left shoulder. (AR 1084). Dr. Bontrager noted weakness of the supraspinatus tendon in the left shoulder and mild anterior impingement. (AR 1084). Hudnall reported pain in all his joints, and Dr. Bontrager noted some mild tenderness in his lumbar area paraspinally and midline. (AR 1084). In March, Hudnall reported worsening back pain after traveling out of state. (AR 1082). Dr. Bontrager documented midline and paraspinal tenderness in Hudnall's low back. (AR 1082). She indicated that Hudnall's headaches were not helped by Inderal and Amlodipine, and that stress and neck muscular pain were important triggers. (AR 1082). In April, Hudnall stated that his back pain was feeling better overall, but that his migraines were not helped much by Verapamil. (AR 1081). Dr. Bontrager observed mild spinal and paraspinal tenderness, and she adjusted his medications. (AR 1081).

In May 2010, Hudnall told Dr. Bontrager that the injections administered by Dr. Stensland did not help his back pain. (AR 1080). He stated that his main problem was taking

13

medication while caring for a child; his headaches had not been as bad lately. (AR 1080). Dr. Bontrager recommended that Hudnall consider obtaining a second opinion from Dr. Roth concerning pain management. (AR 1080). In June, Hudnall reported that his headaches and joint aches were much improved with the addition of Lyrica. (AR 1078). Dr. Bontrager noted improved range of motion overall, but some spinal and paraspinal tenderness. (AR 1078). In July, Hudnall reported improved functioning and resolving joint pain, though he still had continued back pain; he had not had a headache in a week. (AR 1077). Again Dr. Bontrager observed better range of motion, but still some spinal and paraspinal tenderness. (AR 1077).

In September 2010, Hudnall reported to Dr. Bontrager that he had less frequent headaches, but that his back pain continued. (AR 1075). He was not experiencing as much improvement with Lyrica as he had initially. (AR 1075). He had not yet seen Dr. Roth for a second opinion. (AR 1075). Dr. Bontrager noted normal gait, strength, sensation, and balance. (AR 1075). Dr. Bontrager stated: "Even though he is in horrible pain per his statement, he is comfortably sitting in the chair and crosses his legs and does not really seem to be in that much discomfort. It is obvious that the patient has anxiety and that he is stressed and maybe overwhelmed." (AR 1075). In October, Hudnall reported having three to four headaches a week with throbbing in the side of his head and pain in his eyes, but no nausea; he identified stress as a trigger. (AR 1073). Dr. Bontrager wrote that Hudnall's migraines were worsening and that he had chronic back pain with radiculopathy. (AR 1073). In November 2010, Dr. Bontrager wrote that Hudnall's headaches were the same and "severe at times," and that his back pain was unchanged, radiating down his legs intermittently. (AR 1071). Hudnall denied depression at this visit. (AR 1071). He stated that sometimes his medications were more helpful than at other

times. (AR 1071). On exam, Dr. Bontrager observed that Hudnall's gait and reflexes were normal. (AR 1071). In December 2010, Hudnall reported to Dr. Bontrager that he had gone to the emergency room due to chest pain. (AR 1069). Gait and strength were normal. (AR 1069). Dr. Bontrager observed: "No acute distress. He is talking comfortably but yet complains of his sever[e] pain. He also states he has a bad migraine now but still is able to talk and converse with me quite comfortably but he seems to be slightly more irritable." (AR 1069).

In March 2011, Hudnall reported continuing lower back pain to Dr. Bontrager. (AR 1067). He was heading out of state to visit his ill father. (AR 1067). Dr. Bontrager observed tenderness in Hudnall's lumbar and thoracic region and in his paraspinal muscles. (AR 1067). Dr. Bontrager encouraged him to perform gentle walking, better positioning, and back stretches. (AR 1066). In April, Hudnall stated that he felt the Vicodin dosage was helping him to care for his child and to keep up at home; he continued to struggle with anxiety and depression. (AR 1065). On exam, Dr. Bontrager documented tenderness in Hudnall's low back, flexion not quite at 90 degrees, significant pain on extension, and that side-to-side and twisting motions were mildly tolerated. (AR 1065). In May, Dr. Bontrager wrote that Vicodin was not helping as much with Hudnall's back pain, which was of "moderate" severity, but that Cymbalta was working well for his depression. (AR 1063). Dr. Bontrager assessed that Hudnall's migraines were "stable" and occurring two times a week. (AR 1063). On exam, Hudnall had pain at 30 degrees of flexion and less than five degrees extension; he could not tolerate any side-to-side or twisting motions. (AR 1063). She "questioned how he manages to take care of his child at home but [he] states he is careful or he just lives with the pain." (AR 1063). Dr. Bontrager discussed Hudnall's use of pain medication, expressing concerns about his tolerance and that his

medications were increasing. (AR 1063). She stated that more things could be done for his back pain than what she could offer and that he should follow up with Dr. Roth. (AR 1063). Dr. Bontrager assessed that Hudnall's chronic back pain was worsening. (AR 1063).

In June 2011, Hudnall had not yet set up an appointment with Dr. Roth, and he was having back pain on a daily basis, rating it a "six" or "seven" even with medication. (AR 1061). His headaches were the same. (AR 1061). Cymbalta was helping with his depression and to reduce his stress. (AR 1061). A back exam revealed some mild tenderness in the paraspinal muscles. (AR 1061). In July, Hudnall reported that he now had custody of his children and that his medications were helping him manage that new situation. (AR 1059; *see* AR 1035). In August 2011, Hudnall again reported pain at a level "seven"; he had recently returned from visiting his ill father out of state. (AR 1057). His headaches were "well controlled" with Atenolol, and his anxiety was better; however, his back pain was "uncontrolled." (AR 1057). He was still waiting on his insurance authorization to see Dr. Roth for pain management. (AR 1057).

In September 2011, Hudnall reported that he could not sit or stand for periods of time because he "gets really stiff." (AR 1056; *see* AR 1044). On exam, Dr. Bontrager documented significant tenderness with pressure on his back. (AR 1056). Hudnall stated that once home, he had to care for a "toddler along with multiple kids," but that he could "do some delegation of chores." (AR 1056). In October, Hudnall told Dr. Bontrager that he was not feeling well because "he is always in pain." (AR 1054). He had traveled out of state to see his parents to see if he could find someone to stay with them. (AR 1054). On exam, Dr. Bontrager observed that Hudnall's gait was not imbalanced, that his back extension was very limited, that he could flex but not touch his toes, and that twisting was difficult; no back spasms were noted. (AR 1054).

In December 2011, Hudnall reported worsening back pain, particularly in the lumbar region. (AR 1052). He was also having palpitations that caused migraines for the past two weeks. (AR 1052). He had multiple stressors in his life, including an ill parent and child custody issues. (AR 1052). Upon exam, range of motion was somewhat inhibited from normal, with decreased side-to-side and twisting motions; his knee reflexes were normal bilaterally. (AR 1052). Dr. Bontrager assessed that Hudnall's back pain worsened with stress. (AR 1052).

In January through May 2012, Dr. Bontrager saw Hudnall monthly for medication management. (AR 1038, 1040, 1043, 1045, 1047, 1049). In January, Dr. Bontrager indicated that Hudnall's chronic back pain was stable at the time, and she encouraged him to work on stretches for his back and neck. (AR 1043). She wrote that Hudnall desired to see a pain specialist, but he was unable to afford it. (AR 1043). She also assessed that his migraines were "not well controlled"; she encouraged him to work on triggers of stress, weather, and diet. (AR 1043). In February, Dr. Bontrager assessed Hudnall's back pain as stable. (AR 1033). In May, Dr. Bontrager indicated that Hudnall's chronic back pain was worsening. (AR 1045).

In April 2012, Hudnall was interviewed by a clinical social worker at the Northeastern Center, complaining of short-term memory loss, suicidal and homicidal thoughts, fibromyalgia pain, weight loss, and anger. (AR 1107). He was impatient and distracted during the process; he stated that his lawyer wanted him "to see a psychiatrist for disability funds." (AR 1107-08). He was assigned a GAF score of 48 and diagnosed with post traumatic stress disorder ("PTSD"), a somatization disorder, and a pain disorder associated with psychological disorders and a general medical condition. (AR 1107).

In May 2012, Hudnall was seen by Dr. Ali Zulfiqar, a psychiatrist at the Northeastern Center. (AR 1231). Hudnall reported that he was struggling with somatic pain, poor sleep,

nightmares, feeling aggravated, an irritable mood, and weight loss. (AR 1231). He was assigned a GAF score of 50 and diagnosed with PTSD, chronic; partner relational problems; and depression, NOS. (AR 1232). Dr. Zulfiqar adjusted Hudnall's medications. (AR 1232).

Also in May 2012, Dr. Bontrager opined that Hudnall's condition had worsened since her 2009 questionnaires, that he could not afford the therapies that could help him, and that her opinions expressed in the 2009 questionnaires were still substantially the same. (AR 1187-88).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  ANALYSIS

### A.  The Law

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

In determining whether Hudnall is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to assess the following issues in sequence:  (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Id.* at 885-86.

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945.  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 416.920(e), 416.945(a)(5).

On October 24, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision.  (AR 588-601).  He found at step one of the five-step analysis that Hudnall had not worked after his application date of September 10, 2007.  (AR 590).  At step two, the ALJ determined that Hundall had the following impairments:  degenerative disc disease of the lumbar spine, migraine headaches, and major depression.  (AR 590).  At step three, the ALJ found that Hudnall's impairment or combination of impairments were not severe enough to meet a listing.  (AR 591).

Before proceeding to step four, the ALJ concluded that Hudnall's symptom testimony was not entirely credible (AR 594) and assigned the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . except he is limited to occupations which do not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling.  He cannot engage in complex or detailed tasks but can perform simple, routine tasks throughout the workday.

(AR 593).  At step four, the ALJ acknowledged that Hudnall had no past relevant work.  (AR 599).  At step five, based on the assigned RFC and the VE's testimony, the ALJ concluded that a hypothetical individual with Hudnall's RFC, experience, and education could perform a significant number of unskilled, light occupations in the economy, including small products assembler, hand packager, and cleaner.  (AR 600).  Therefore, Hudnall's claim for SSI was denied.  (AR 601).

### C. The ALJ's Consideration of the Opinion of Dr. Bontrager, Hudnall's Treating Physician, Will Be Remanded

Hudnall first argues that the ALJ improperly discounted the opinions of his treating physician, Dr. Bontrager.  The Court agrees that the ALJ's decision to assign "no weight" to Dr. Bontrager's opinion and "great weight" to the state agency doctors' opinions is not supported by

substantial evidence.

The Seventh Circuit Court of Appeals has explained that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 416.927(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 416.927(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner applies the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. § 416.927(c). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 416.927(c)(2).

As explained above, in weighing the medical source opinions of record, the ALJ rejected the opinion of Dr. Bontrager, Hudnall's treating family physician, who saw Hudnall more than 40 times from November 2007 to May 2012.[7] Instead, the ALJ assigned "great weight" to the

_____

[7] A medical summary provided by Hudnall's counsel reflects that Hudnall continued to see Dr. Bontrager on a monthly basis through May 2014 (AR 1308-16); however, these treatment notes are not in the record.

opinions of Dr. Brill, the state agency physician who reviewed Hudnall's record in December 2007, and Dr. Whitley, the state agency physician who affirmed Dr. Brill's opinion in February 2008. (AR 598).

To review, in October 2009, Dr. Bontrager opined, among other things, that Hudnall could sit, stand, or walk for less than 30 minutes at a time and less than one hour total in an eight-hour workday, and must never bend, squat, crawl, climb, or reach. (AR 1206). Dr. Bontrager further opined that Hudnall's chronic pain, depression, and headaches cause him difficulty in concentrating; in attending; in understanding, remembering, and carrying out instructions; in "[r]esponding appropriately to superior, coworkers [and] situations"; in performing sustained activity on a consistent basis; and in traveling alone to or from work. (AR 1206). In May 2012, Dr. Bontrager wrote that Hudnall's condition had worsened since her October 2009 report, and that her opinion about his functional capacity was still the same as in her prior report. (AR 1187).

The ALJ articulated several reasons for rejecting Dr. Bontrager's opinions: (1) that Dr. Bontrager's "examinations were largely normal," (2) that "she noted several instances when the claimant seemed to be exaggerating pain," (3) that "she was aware of the minimal MRI findings," (4) that she "apparently adopted [Hudnall's] subjective complaints as her medical opinion of his functioning," and (5) that the extreme limitations were inconsistent with Hudnall's daily activities. (AR 598). Hudnall challenges four of the ALJ's five stated reasons.[8]

First, Hudnall argues that the ALJ's "one-sentence declaration" that Dr. Bontrager's

---

[8] Hudnall does not dispute that his MRI findings were relatively mild, revealing minimal disc bulging at several levels, mild facet joint degenerative changes, but no significant neural compressive lesion. That fact, however, is not determinative concerning the limitations opined by Dr. Bontrager, as "in certain situations, pain alone can be disabling, even when its existence is unsupported by objective medical evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (citation omitted).

exams were "largely normal" is "a conclusion not a reason, much less a good reason" for rejecting Dr. Bontrager's opinions. (DE 20 at 16); *see Mueller v. Astrue*, 493 F. App'x 772, 776 (7th Cir. 2012) ("When discounting a treating physician's opinion, an ALJ must give 'good reasons.'" (quoting 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010))). Hudnall argues that the record reveals many abnormal findings on physical exam, including: cervical, lumbar, and paraspinal tenderness (AR 426, 444, 447, 1056-57, 1061, 1063, 1065, 1067, 1077, 1080-82, 1084, 1089); pain radiating into the right leg or buttocks (AR 426); reduced spinal range of motion (AR 426, 440, 444, 1052, 1054, 1061, 1065, 1092); pain in the thoracic and lumbar areas (AR 440, 442, 1065, 1069); and muscular tightness (AR 1052, 1061). (*See* DE 20 at 17-18). Furthermore, it is unclear what type of additional findings the ALJ thought Dr. Bontrager should have documented concerning Hudnall's migraine headaches. (*See*, *e.g.*, AR 1043 ("Migraines – not well controlled"), 1052 ("Migraines – worsening due to increased stress"), 1057 ("Headaches are do[in]g well with atenolol"), 1061 ("Headaches the same but not worse."), 1063 ("migraines – stable, no changes. 2 times a week."), 1077 ("no headaches in a week – when they come it's not as bad."), 1080 ("headaches not as bad lately."), 1081 ("migraines – not helped much by Verapamil"), 1082 ("has failed [I]nderal and [A]mlodipine . . . stress is an important trigger; also neck muscle pain"), 1084 ("continues to have headaches. [V]icodin is not working well."), 1089 ("wakes up with headache")). "While a claimant's self-reported symptoms alone are insufficient to establish disability, these symptoms, when documented by a physician in a clinical setting are, in fact, medical signs which are associated with severe migraine headaches and are often the only means available to prove their existence." *Leeson v. Colvin*, No. 1:14-cv-01223-RLY-TAB, 2015 WL 5228026, at *3 (S.D. Ind. Sept. 8, 2015) (citing 20 C.F.R. § 404.1528(a); *Carradine*, 360 F.3d 751; *Villano v. Astrue*,

556 F.3d 558 (7th Cir. 2009)).

Next, Hudnall argues that the ALJ improperly rejected Dr. Bontrager's opinions based on the ALJ's misperception that two of Dr. Bontrager's notes show that he was exaggerating his pain. (AR 1075 ("Even though he is in horrible pain per his statement, he is comfortably sitting in the chair and crosses his legs and does not really seem to be in that much discomfort. It is obvious that the patient has anxiety and that he is stress and maybe overwhelmed."), 1069 ("He is talking comfortably but yet complains of his sever[e] pain. He also states he has a bad migraine now but still is able to talk and converse with me quite comfortably but he seems to be slightly more irritable.")). But Dr. Bontrager never actually wrote that she believed Hudnall was exaggerating his pain. Rather, she continued to prescribe Hudnall various pain medications, including Percocet and Vicodin, and she referred him to a pain management specialist. *See Carradine*, 360 F.3d at 754 (recognizing the improbability that medical personnel "would prescribe drugs and other treatment for [the claimant] if they thought she were faking her symptoms"). Moreover, in April 2012, the Northeastern Center diagnosed Hudnall with a somatization disorder and a pain disorder associated with psychological factors and a general medication condition. (AR 1107). That pain may be psychological in origin does not equate to a finding of exaggeration. *See Carradine*, 360 F.3d at 754.

Another issue is that the ALJ relied heavily on the opinions of the state agency doctors, assigning them "great weight." (AR 598). But the state agency doctors' opinions were rendered *six years* before the July 2014 hearing, making them extremely remote in time by the hearing date. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[T]he ALJ would be hard-pressed to justify casting aside [the treating doctor's] opinion in favor of these earlier state-

agency opinions . . . [which] were two years old [by the time the ALJ held a hearing].").  Further amplifying this problem is the fact that all of Dr. Bontrager's medical source opinions and almost all of her treatment notes were rendered *after* the state agency doctors reviewed the record and issued their opinions.  As such, the state agency doctors never saw Dr. Bontrager's 2009 and 2012 opinions, much less the majority of her treatment notes, all of which were "the most recent professional word on [Hudnall's] . . . impairments."  *Id.*; *see also Coppage v. Colvin*, No. 2:13-CV-405-PRC, 2015 WL 1243321, at *12 (N.D. Ind. Mar. 17, 2015) (remanding the case and noting that "the significant weight the ALJ gave to the consultative reviewers' opinions is suspect in light of the time that elapsed between their June and July 2011 opinions and the August 2012 hearing given the intervening medical records, the subsequent treating physician opinions, and Plaintiff's testimony").

Thus, the state agency doctors did not know that Dr. Bontrager documented in May 2011 and May 2012 that Hudnall's chronic back pain was worsening (AR 1045, 1052, 1063), that Hudnall was seen by a pain management specialist in April 2009 (AR 428), that the Northeastern Center diagnosed him with a somatization disorder and a pain disorder in April 2012 (AR 1107), and that Dr. Bontrager in January 2012 indicated that Hudnall's migraine headaches were not well controlled[9] (AR 1043).  This evidence could reasonably have changed the state agency physicians' opinions.  *See, e.g.*, *Bledsoe v. Colvin*, No. 1:14-cv-00011-SEB-MJD, 2014 WL 8183003, at *9 (S.D. Ind. Oct. 31, 2014) (remanding case to consider the evidence of headaches that accumulated after the state agency doctors completed their reviews); *Busler v. Colvin*, No.

_____

[9] This is in contrast to the ALJ's assessment of Hudnall's migraines that "[i]n June 2010, [t]he claimant reported that Lyrica was helping with his headaches."  (AR 597).  In fact, the medical summary provided by Hudnall's counsel suggests that Hudnall's migraines and back pain continued to worsen between May 2012 through May 2014.  (AR 1309-16).

12-CV-76-wmc, 2014 WL 976933, at *5 (W.D. Wis. Mar. 12, 2014) (remanding case to consider more recent X-rays and related evidence that came into existence after the state agency doctors' review).

Next, Hudnall challenges the ALJ's rejection of Dr. Bontrager's limitations for the reason that the ALJ perceived them to be based on Hudnall's subjective complaints. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("ALJs may discount medical opinions based solely on the patient's subjective complaints[.]" (citing *Ketelboeter v. Astrue* , 550 F.3d 620, 625 (7th Cir. 2008))); *see also Dixon*, 270 F.3d at 1177 ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995))). But as already explained above, Dr. Bontrager documented clinical exam findings (AR 426, 440, 444, 447, 1052, 1054, 1056-57, 1061, 1063, 1065, 1067, 1077, 1080-82, 1084, 1089, 1092), and opined that Hudnall's depression and migraine headaches contribute to his pain (AR 447, 1206). Thus, Dr. Bontrager's opinion was supported by some clinical examination findings and was not based solely on Hudnall's complaints.

Finally, the ALJ viewed that Hudnall's daily activities—in particular, his ability to care for his infant son in 2008 on a daily basis and his ability to care for a toddler ("along with multiple other kids," on at least on one occasion) in 2011—undercut his testimony of disabling limitations. (AR 594). But these daily activities are not necessarily inconsistent with his testimony of the need for intermittent breaks during the day due to his back pain and his migraine headaches (AR 619-22), as there likely are significant periods of time during the day in which Hudnall can rest in between caring for his child's needs. *See Engstrand v. Colvin*, 788

F.3d 655, 661 (7th Cir. 2015) (remanding credibility determination, finding that the claimant's "reported activities were quite consistent with his testimony that he cannot stand for very long without pain and that he needs to frequently alternate between sitting, standing, and lying down"); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (stating that ALJs must recognize that "full-time work does not allow for the flexibility to work around periods of incapacitation" (citations omitted)).

The ALJ also seized upon the fact that Hudnall's medical records reveal that he played pool on one occasion, helped move furniture on one occasion, and took several car trips out of state to see his ill parents. (AR 594). But "working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Engstrand*, 788 F.3d at 661 (citations omitted); *see Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("[N]o employer is likely to hire a person who must stop working and lie down two to three times a day for an hour at a time, or who requires multiple days to complete tasks other employees might finish in one workday." (citation omitted)). Nor is occasional travel out of state, especially for the purpose of visiting ill parents, necessarily inconsistent with a finding of disability. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) ("[T]he record does not indicate how going on vacation was inconsistent with Murphy's claimed degree of physical limitation.").

Moreover, "[a] person can be totally disabled for purposes of entitlement to social

security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (citations omitted) ("Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts."); *see Roddy*, 705 F.3d at 638 ("The fact that Roddy pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled." (citation omitted)). As such, the ALJ failed to explain how Hudnall's daily activities are inconsistent with his complaints of disabling back pain and migraine headaches. *See Engstrand*, 788 F.3d at 661 (finding that the claimant's driving his family to work and activities, and his helping with seated tasks on the family farm, was not inconsistent with being unable to engage in substantial gainful activity); *Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times a month, were not inconsistent with her claims of disabling pain); *Zurawski*, 245 F.3d at 887 (same).

In sum, the Court is not necessarily suggesting that Dr. Bontrager's opinion is entitled to controlling weight given its inconsistency with the opinions of the state agency doctors. Rather, the Court simply concludes that the ALJ did not provide good reasons for assigning "no weight" to the opinions of Dr. Bontrager, Hudnall's treating physician, while assigning "great weight" to the state agency doctors' opinions, where the state agency doctors' opinions were rendered *six years prior to the hearing* and where they were not based on a complete summary of the relevant medical evidence before the ALJ. By relying on state agency doctors' opinions that were so remote in time and that were not based on a complete review of the medical evidence, the ALJ

essentially "played doctor" and made his own independent medical findings. But "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citations omitted). That is, ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)); *see, e.g.*, *Bellinghiere v. Astrue*, No. 10 C 6184, 2011 WL 4431023, at *8 (N.D. Ill. Sept. 22, 2011) (remanding case where the medical opinions relied upon by the ALJ to reject the treating physician's opinions were not based on a complete review of the relevant medical evidence, and thus, the ALJ impermissibly substituted her judgment for that of the claimant's treating physicians).

Accordingly, the Commissioner's final decision will be remanded for reconsideration of the medical source opinion evidence in accordance with the factors set forth in 20 C.F.R. § 416.927(c)(2) and reassessment of Hudnall's RFC with respect to his multiple impairments.[10]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Hudnall and against the Commissioner.

SO ORDERED.

Entered this 9th day of August 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[10] Because a remand is warranted on these grounds, the Court need not reach Hudnall's remaining arguments.